UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
INTELLIGEN POWER SYSTEMS, LLC,

                              Plaintiff,

   -against-

dVENTUS TECHNOLOGIES LLC,

                             Defendant.
------------------------------------------------------------X

Case No. 14 Civ. 7392 (PAE)

**AMENDED COMPLAINT**

Plaintiff Intelligen Power Systems, LLC ("Intelligen"), by its attorneys Morrison Cohen LLP, as and for its amended complaint against defendant dVentus Technologies LLC ("dVentus") alleges as follows:

## NATURE OF THIS ACTION

1. This action arises from a supply agreement dated May 7, 2013 (the "Agreement") entered into between Intelligen and dVentus for dVentus' fabrication of a synchronous generator and inverter package (the "Equipment"). dVentus first contacted Intelligen in September 2012 claiming that its equipment, used in the wind turbine industry, could be easily adaptable to the co-generation systems which Intelligen designs, fabricates, installs and maintains for its customers. Although the Equipment is highly specialized, dVentus represented, at the time of the negotiation of the Agreement, that it manufactured synchronous generators and inverters used in the wind turbine industry and that its technology and expertise, which existed at that time, were easily adapted to Intelligen's needs.

2. Cogeneration is the process whereby a single fuel source, such as natural gas, is used to produce both electrical and thermal energy. An onsite cogeneration system is more efficient than a utility operated central power plant because thermal energy that would

#5513678 v5 \024083 \0002

otherwise be wasted is captured and used at the facility. Producing electricity creates heat. Cogeneration equipment captures that heat and uses it to supply hot water, steam, space heating and cooling. The result is a much more efficient use of fuel which can generate substantial savings for the end user while lowering their carbon footprint.

3. The New York State Energy Research and Development Authority ("NYSERDA") offers substantial incentive programs to use this technology. NYSERDA is a public benefit corporation that offers objective information and analysis, innovative programs, technical expertise, and funding to help increase energy efficiency, save money, use renewable energy, and reduce reliance on fossil fuels in New York State.

4. Intelligen's cogeneration systems use a natural gas fired engine to spin a generator to produce electricity. Con Edison requires an inverter based system be used at the interface between the electrical generator at the building and the Con Edison utility grid. Intelligen sought to incorporate the Equipment into its standardized package for projects in the Con Edison territory and must meet NYSERDA requirements in order to be eligible for NYSERDA incentives.

5. Intelligen was interested in working with dVentus because Intelligen had an order for a project which required the inclusion of the Equipment to obtain a NYSERDA incentive. Intelligen saw the potential for substantial additional projects that could benefit from the inclusion of the Equipment. dVentus promised that it could supply Intelligen with its Equipment needs.

6. dVentus' principal, Daniel Gizaw ("Gizaw"), claimed that he personally had relevant experience in the fabrication of the Equipment.

7. Gizaw represented that dVentus had engineers who formerly worked at a company which manufactured equipment for use in co-generation systems manufactured by a competitor of Intelligen.

8. Gizaw represented that dVentus could meet a tight time-frame for design and delivery of the initial units to meet Intelligen's needs based on the pending order.

9. Pursuant to the May 7, 2013 invoice from dVentus (which formed part of the parties' contract) (the "Invoice"), dVentus agreed to ship the equipment from dVentus' Ann Arbor facility within 16 weeks of the Invoice date.

10. In March 2014, ten months later, Intelligen terminated the Agreement because dVentus failed to deliver the Equipment and could provide no date by when the Equipment would be completed or concrete evidence that it could ever complete fabrication.

11. As a result of dVentus' failure to perform, Intelligen has been forced to spend hundreds of thousands of dollars to hire a replacement firm to design and manufacture the Equipment, has had to reconfigure the installation of the Equipment for the customer project for which the Equipment was originally ordered based on differences from what Intelligen expected from dVentus to what was ultimately supplied, lost a follow-on contract with its original customer, lost significant operations and maintenance revenues due to the delays, and had to incur the cost and delay of resubmitting its application for a NYSERDA incentive program.

## THE PARTIES

12. Intelligen is a New York limited liability company with its principal place of business at 301 Winding Road, Old Bethpage, New York 11804.

13. Upon information and belief, dVentus is a Michigan limited liability

#5513678 v5 \024083 \0002

company with its principal place of business at 43511 Revere Drive, Ann Arbor, Michigan 48107.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) based upon the complete diversity of citizenship among the parties. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim occurred in this district.

## THE FACTS COMMON TO ALL CLAIMS

16. Intelligen repeats and realleges each of the allegations made heretofore as if set forth fully herein.

17. Intelligen is a manufacturer of pre-packaged cogeneration equipment for onsite production of combined heat and power ("CHP") on an environmentally friendly basis.

18. David Lesser ("Lesser") is President of Intelligen.

19. Sal Cona ("Cona") is the Chief Operating Office of Intelligen.

20. According to its website http://www.dventus.com/index.php/pages/dventus, dVentus is a renewable energy technology company that develops and manufactures innovative and customized solutions for energy conversion and energy management systems for the ever growing energy and clean transportation sectors targeted for emerging markets.

21. Upon information and belief, Gizaw, a resident of the State of Michigan, is Chief Executive Officer and managing member of dVentus.

#5513678 v5 \024083 \0002

4

**dVentus Contacts Intelligen For the Purpose of Selling a Generator and Inverter Package**

22. In or about June 2012, dVentus contacted Intelligen, seeking to supply Intelligen with the Equipment.

23. In a June 14, 2012 email from Fana A. Abay ("Abay"), a marketing employee of dVentus, to Cona, dVentus represented that it was "an ISO 9001:2008 certified company."

24. In Abay's June 14, 2012 email, dVentus further represented that it had "broad experience from design to production of highly efficient variable speed generators and electronics drive products turning them into customized solutions for energy and clean tech transportation."

25. In Abay's June 14, 2012 email, dVentus further represented that dVentus' generators "have the following features: light weight and compact in design, low-noise, nearly maintenance free, and operate at a higher efficiency over a wider range of power output reducing operating cost significantly."

26. Over the course of the time period of September 2012 through May 2013, Gizaw and Lesser and/or Cona had multiple conversations via Skype, telephone and email and one in-person meeting concerning dVentus' proposed sale of the Equipment to Intelligen. The discussions focused on dVentus convincing Intelligen that dVentus readily possessed the design, engineering and manufacturing capabilities to produce the Equipment, including the need to comply with NYSERDA and Con Edison requirements and other specifications relative to the integration of the Equipment into Intelligen's CHP system.

## Material Misstatements Made by dVentus

27. In order to induce Intelligen to enter into a contract with dVentus to purchase the Equipment, dVentus falsely represented that it had a manufacturing and testing facility in Ann Arbor, Michigan, that it had sufficient engineering expertise to adapt its technology to CHP, that it would fabricate the equipment within 16 weeks, with four weeks of final assembly and testing in Ann Arbor, that it would absorb engineering costs, other than as set forth in the Invoice, that it would follow a "Six Sigma" approach to ensure Intelligen's satisfaction, that it would make a trip to Intelligen's facility in New York shortly after Intelligen placed the order in order to address engineering, and that it would have weekly status calls relating to its progress of fabrication. Upon information and belief, these representations were false when made.

28. Gizaw represented to Cona that dVentus had a facility located in Ann Arbor, Michigan in which it would assemble and test the Equipment for Intelligen. This representation is corroborated in the point of delivery section of the Invoice which states "FOB Ann Arbor." This representation was material because Intelligen wanted a facility in the United States where the Equipment could be manufactured in relative proximity to Intelligen and shipped to Intelligen quickly.

29. dVentus represented that it had the manpower and engineering capability to adapt its existing inverter product to the CHP industry, the customer's needs, as well as NYSERDA and Con Ed requirements. This representation was material because Intelligen sought to work with a manufacturer who had existing capability and knowledge to design and manufacture the Equipment. This representation was made to Lesser and Cona at a meeting at

IntelliGen's facility in New York in April 2013, just prior to placing the order, as well as during the various conversations leading up to such meeting.

30. dVentus represented that it possessed the capability to configure the Equipment for use in either 208 Volt or 480 Volt configuration. This representation was material because although most of Intelligen's systems require a 480 Volt configuration, the first order required a 208 Volt configuration. Gizaw assured Intelligen that its Equipment could be readily modified for either a 480 or a 208 Volt application during the April 2013 meeting with Lesser and Cona at Intelligen's facility in New York.

31. Gizaw represented that dVentus had electrical engineering expertise personally and in an email dated November 26, 2012 in which he introduced "Mekdam", his engineering manager. This representation was material because Intelligen needed someone with electrical engineering expertise sufficient to design and manufacture the Equipment and Intelligen would never have proceeded with dVentus if it did not possess experience manufacturing synchronous converters and generators. Intelligen was not interested in contracting with a company that would develop a product from "scratch". Intelligen had one pending order and a significant pipeline of potential projects and needed the Equipment to be timely delivered.

32. In the same email, Gizaw represented that he could accommodate UL 1741, the "anti-islanding" requirement for distributed generation systems interconnected with the grid, and IEEE 1547, the standard for interconnecting distributed generation systems to the grid.

33. In a telephone presentation dated November 26, 2012, Gizaw represented that he had a generator and converter package designed for the wind turbine industry which

#5513678 v5 \024083 \0002

7

could be easily adapted to CHP. This representation was material because Intelligen would not have entered into the Agreement if dVentus lacked a product that could be the starting point for the fabrication of the Equipment.

34. During the November 26, 2012 presentation, Gizaw acknowledged that since a CHP engine operates at a fixed speed rather than a variable speed as with a wind turbine, adapting his technology for use with CHP would be simple for dVentus.

35. Gizaw sent a schematic diagram to Intelligen on November 26, 2012 which was designed to show the significant development of the dVentus product and that the engineering required to convert the Equipment for use in a CHP system was easily accomplished once Intelligen placed an order.

36. By email dated January 27, 2013, Gizaw confirmed that the delivery would take 20 weeks "if everything looks good."

37. In February 2013, in reliance on Gizaw's representation, Intelligen applied for NYSERDA approval for its system, incorporating the Equipment, in order to comply with the NYSERDA CHP accelerated catalog program. Intelligen underwent significant time and expense to have the NYSERDA CHP incentive approved using the Equipment to be supplied by dVentus.

38. In a conference call dated on or about March 15, 2013, Gizaw represented that he had six engineers who would be assigned to Equipment fabrication.

39. During the March 15, 2013 conference call, Gizaw confirmed his understanding that both UL 1741 and IEEE 1547 compliance was required.

40. On March 18, 2013, Gizaw sent an email to Cona providing a pricing

#5513678 v5 \024083 \0002

8

estimate and an estimated lead-time of 16 weeks, plus 4 weeks for testing, plus the time to ship components from Ethiopia to Ann Arbor.

41. On or about April 13, 2013, in a face to face meeting which took place at Intelligen's factory, Gizaw made the following representations on which Intelligen relied:

   a) He personally had electrical engineering capability and was supported by a team of additional engineers.
   b) dVentus possessed a generator and converter package designed for the wind turbine industry which could be easily adapted to CHP.
   c) He presented a power point presentation during which he highlighted the engineering and manufacturing capability of dVentus.
   d) He stated that dVentus had over 30 design engineers.
   e) He stated that dVentus had manufacturing capabilities in Ethiopia and Michigan.
   f) He stated that the equipment would be partially fabricated in dVentus' Ethiopia facility and shipped to its Michigan facility for final assembly and factory testing. This is corroborated by the Invoice which states that the unit would be shipped "FOB Ann Arbor."
   g) Gizaw confirmed that it would be no problem for dVentus to manufacture the unit in 208 Volt.

42. During this meeting, Gizaw stated that lead times for the first set of units was approximately sixteen weeks and that future deliveries would be faster.

43. During this meeting, Gizaw spoke at length about how he follows a "Six Sigma Approach" to ensure customer satisfaction. Gizaw explained that as part of this, an engineering meeting would occur at Intelligen's offices promptly after signing the Agreement. Reliability and accessibility were important to Intelligen because Intelligen wanted dVentus to supply its need of the Equipment. It had a number of projects in the pipeline and a larger scale fabrication required dependability and reliability.

#5513678 v5 \024083 \0002

9

44. Despite numerous requests by Intelligen, the face to face meeting with dVentus engineers after the Agreement was executed never happened.

45. By email dated April 17, 2013, Gizaw represented that the Equipment would comply with Con Edison requirements.

46. By email dated April 21, 2013, Gizaw stated that "please note we are not charging you the whole amount required for engineering and the tooling and testing is O [zero] cost to IntelliGenPower."

47. By conference call dated April 23, 2013, Gizaw represented that he had 35 employees, including five in dVentus' Michigan facility.

48. Absent these representations and assurances, Intelligen would not have entered into the Agreement or paid the deposit required by the Agreement.

49. On or about April 24, 2013, shortly before Intelligen and dVentus entered into the Agreement, Intelligen submitted a purchase order for the Equipment to dVentus for a total amount of $201,050.00 (the "Purchase Order").

50. Contemporaneously with the execution of the Agreement, on or about May 7, 2013, and thus as part of the contract between the parties, dVentus submitted the Invoice to Intelligen which demanded a deposit of $78,551.00 for the Equipment ordered pursuant to the Purchase Order (the "Deposit").

51. The Invoice indicated that the Equipment would be shipped 16 weeks from that date.

52. Intelligen paid the $78,551.00 due under the Invoice on or about May 9, 2013 by wire transfer.

53. On or about September 6, 2013, Intelligen provided dVentus with parts and equipment as dVentus requested for design and testing (the "Parts").

**The Supply Agreement**

54. Under Section 2.2 of the Agreement, dVentus was obligated to sell to Intelligen the "Planned Volume" of the Equipment as long as Intelligen was not in material breach of the Agreement. "Planned Volume" was defined in Section 2.1.4 as Intelligen's desired volume of the Equipment.

55. Under Section 2.3 of the Agreement, dVentus covenanted and agreed that it possessed and maintained the necessary capacity, machinery, personnel and resources to sell to Intelligen at least the volume of Equipment necessary to meet the Planned Volume.

56. Pursuant to Section 5 of the Agreement, "No extra charge of any kind will be allowed unless specifically agreed in writing by BUYER." The BUYER is Intelligen.

57. Pursuant to Section 8 of the Agreement, the failure to meet delivery dates entitles Buyer to "Liquidated Damages."

58. Pursuant to Section 8.4 of the Agreement, delivery may be postponed for a maximum of 4 weeks only.

59. Section 13.3 of the Agreement permitted either party to terminate the Agreement if the other committed a material breach that remained uncured for fifteen (15) days after written notice was delivered to the breaching party.

60. Under Section 13.4 of the Agreement, dVentus was required, upon termination of the Agreement, to return to Intelligen all Intelligen-owned tooling, test equipment and other property, and to bear all costs associated with repair or replacement should such

equipment and property not be fully functional or damaged.

**dVentus Fails to Perform**

61. By email of May 8, 2013, Gizaw stated he planned to order long lead time items "as of today or latest next few days."

62. By email dated May 9, 2013, Gizaw represented that he would order parts "this week" and that Intelligen should expect "weekly conference call[s]."

63. On May 16, 2013, Intelligen (Lesser and Cona) and dVentus (Gizaw and members of his "engineering team") held a kickoff conference call. During this call, Gizaw confirmed that Intelligen and dVentus would hold weekly conference calls to discuss status. During this call, dVentus represented to Intelligen that it had placed orders for the long lead time components, including power modules and enclosures, and that the order for the rotor magnets was in process.

64. As of July 18, 2013, in a telephone call with Cona, Gizaw stated that the lead time was on track for 12 weeks.

65. As of August 18, 2013, Gizaw confirmed that delivery was on schedule.

66. dVentus failed to deliver the Equipment by September 2013, as promised.

67. In or about October 2013, Intelligen continued to seek updates regarding the status of the design, ordering of components and fabrication of the Equipment, but dVentus became increasingly non-responsive, in spite of the promises dVentus made prior to Intelligen executing the Agreement.

68. When calls did occur, Intelligen pressed for specifics regarding the status of the orders for components but dVentus was unwilling to provide specifics.

#5513678 v5 \024083 \0002

12

69. In or about July 2013, dVentus pushed back the date of delivery of the Equipment from September 2013 to October 2013.

70. On or about October 29, 2013, Gizaw admitted that dVentus had not ordered any parts as he represented he would promptly do upon the execution of the Agreement and had represented had been done after the placing of the order.

71. Intelligen became increasingly frustrated with dVentus' failure to deliver the Equipment or any proof that dVentus was moving forward to meet its obligations.

72. Upon information and belief, dVentus does not have a factory in Ann Arbor, Michigan.

73. On or about December 3, 2013, dVentus agreed to come to New York to discuss the status of the project on December 6, 2013. On December 5, 2013, Gizaw cancelled the trip.

74. In or about December 2013, Gizaw again pushed the date of delivery back to February 2014, five months after the Equipment was originally promised.

75. On January 29, 2013, Gizaw "sincerely apologize[d]" for the delays which he attributed to problems with "suppliers, logistics and long term financing."

76. As of March 2014, dVentus was still unable to provide Intelligen with a firm delivery date for the Equipment.

77. Consequently, pursuant to Section 13.3 of the Agreement, Intelligen put dVentus on notice of dVentus' material breach of the Agreement by written letter dated March 21, 2014.

78. dVentus failed to cure its breach within 15 days of written notice, as it was

#5513678 v5 \024083 \0002

required to do under Section 13.3 of the Agreement. The Agreement was therefore terminated.

79. dVentus argued, for the first time, that Intelligen had changed the design and/or engineering specifications for the Equipment in early 2014.

80. Intelligen commenced this action by summons with notice in the Supreme Court of the State of New York, County of New York on April 28, 2014.

81. The address set forth in the Agreement is, upon information and belief, Gizaw's home and not a factory or testing facility.

82. Between May 5, 2014 and September 15, 2014, Intelligen attempted service on eleven different occasions at Gizaw's home.

83. On one or more of those occasions, the process server communicated with Gizaw's wife, who declined to accept service.

84. Counsel for Intelligen repeatedly requested that dVentus' counsel accept service, but he declined.

85. A copy of the Summons with Notice outlining Intelligen's claims was affixed to Gizaw's front door and mailed to him in June 2014.

86. Upon information and belief, Mr. Gizaw was aware that Intelligen had commenced this action.

87. By email dated August 20, 2014, dVentus purported to invoice Intelligen for, among other things, additional engineering costs totaling over $200,000, and the balance of the purchase price, although payment would not be due until prior to shipment (after testing) with the final payment due at the startup of the Equipment on the job site, as set forth in Intelligen's purchase order.

88. Intelligen promptly objected to the alleged invoice and objected to any additional cost for engineering under the terms of the Agreement.

89. dVentus has never provided any proof that it has fabricated the Equipment, despite due demand for such proof, has not delivered any of the Equipment to Intelligen, has not returned the Parts Intelligen provided to dVentus and has failed to return Intelligen's $78,551.00 deposit under the Invoice.

90. dVentus purported to provide photographs of the Equipment after the commencement of this action but such photographs are undated and fail to substantiate that the Equipment had actually been fabricated.

91. As a result of Intelligen's reliance on dVentus' knowing misrepresentations, it has incurred the following damages (amounts not listed to be determined at trial):

    a. Net losses from lost service revenue from a sale contract with the ultimate customer, Avalon Bay (the "First Avalon Project") for a period of 18 months (to date);

    b. Net losses arising from the cancellation of a second equipment sale to Avalon Bay (the "Second Avalon Project") due to the delays caused by dVentus on the First Avalon Project;

    c. Net losses from lost service revenue from the Second Avalon Project for a period of 5 years;

    d. $20,000.00 arising from Intelligen's search for a new inverter supplier for the First and Second Avalon Projects;

    e. $200,000.00 to acquire replacement inverters and generators for

the First and Second Avalon Projects;

    f.    Costs to reconfigure the installation of the replacement inverters and generators for both the First Avalon Project of $76,000.00 for electrical construction, $13,000.00 for transformers, and $48,000.00 for air conditioning (the replacement inverters being air cooled versus water cooled for the dVentus units), for a total of $137,000.00;

    g.    $50,000.00 arising from the additional engineering labor needed to implement the new inverter systems for the First Avalon Project;

    h.    $78,551.00 from the Deposit to dVentus that was never returned; and

    i.    The value of the Parts sent to dVentus but never returned.

## COUNT I
### (Fraudulent Inducement)

92.    Intelligen repeats and realleges each and every preceding allegation as if fully set forth at length herein.

93.    dVentus made the following material representations to Intelligen prior to the parties entering into the Agreement, in emails, in telephone and Skype calls which took place between September 2012 through May 2013 and during the April 2013 face to face meeting:

    a.    dVentus had a facility in Ann Arbor, Michigan where dVentus would assemble and test the Equipment for Intelligen;

    b.    dVentus possessed a generator and converter package designed for the wind turbine industry which could be easily adapted to CHP;

    c.    dVentus had sufficient manpower and engineering expertise to

#5513678 v5 \024083 \0002

16

adapt its technology to CHP including the needs of Intelligen's customers, as well as the NYSERDA and Con Ed requirements;

    d.  dVentus employed over 30 design engineers who possessed the relevant experience to ensure timely fabrication of the Equipment and to timely and promptly fulfill Intelligen's orders;

    e.  Gizaw personally had electrical engineering capability sufficient to design and manufacture the Equipment;

    f.  dVentus had the capability of configuring the Equipment for use with 208 Volt or 480 Volt; and

    g.  dVentus possessed the financial resources to complete the design and manufacture of the Equipment.

  94.  These representations were false when made, and dVentus knew of their falsity at the time they were made.

  95.  dVentus made these representations intending that Intelligen would rely upon them and would agree to enter into the Agreement. dVentus did so in order to secure the Agreement with Intelligen and also, upon information and belief, to use the Agreement with Intelligen to help obtain financing from other sources.

  96.  Upon information belief, dVentus was negotiating to obtain financing from a third party at the time the Agreement was signed and had not secured that financing until after the Agreement was signed.

  97.  Intelligen justifiably relied on each of these affirmative representations in entering into the Agreement and paying the deposit to dVentus.

98. Had Intelligen known that these representations were false, Intelligen would not have entered into the Agreement and would not have paid any money to dVentus.

99. As a proximate result of dVentus' fraudulent conduct, Intelligen has suffered out-of-pocket damages in the amount of $485,551.00, plus the value of the Parts sent by Intelligen to dVentus which were never returned.

## COUNT II
### (Breach of Contract)

100. Intelligen repeats and realleges each and every preceding allegation as if fully set forth at length herein.

101. In May 2013, Intelligen and dVentus entered into the Agreement, which included the Invoice that was submitted by dVentus to Intelligen contemporaneously with the Agreement.

102. Intelligen has performed all of its obligations under the Agreement, and dVentus has never placed Intelligen on notice of any material breach.

103. In violation of Section 2.2 of the Agreement and the Invoice, dVentus failed to deliver the Equipment requested by Intelligen in the Purchase Order within the contractually-required 16 weeks under the Invoice. Alternatively, dVentus failed to deliver the Equipment to Intelligen within a "reasonable time" as required by New York Uniform Commercial Code § 2-309(1).

104. In violation of Section 8.4 of the Agreement, dVentus postponed delivery of the Equipment for a period greater than 4 weeks.

105. In violation of Section 2.3 of the Agreement, dVentus failed to possess or

maintain the necessary capacity, machinery, personnel and resources to sell to Intelligen the volume of Equipment necessary to meet the Planned Volume.

106. In violation of Section 13.4 of the Agreement, dVentus failed to return the Parts to Intelligen upon termination of the Agreement.

107. As proximate result of dVentus' breach of the Agreement, Intelligen has suffered damages in an amount to be determined at trial, including: (a) $485,551.00 in out-of-pocket damages, plus the loss of its Parts or the monetary equivalent thereof; and (b) general and foreseeable damages arising from the net losses associated with the First and Second Avalon Projects.

## COUNT III
### (Replevin)

108. Intelligen repeats and realleges each and every preceding allegation as if fully set forth at length herein.

109. Intelligen is the only rightful owner possessing good title to the Parts.

110. dVentus is in possession of the Parts.

111. Despite Intelligen's demand for the Parts, dVentus has refused to deliver the Parts to Intelligen.

112. dVentus' retention of the Parts is unlawful.

113. By reason of the foregoing, Intelligen is entitled to the immediate possession of the Parts, and dVentus must immediately deliver the Parts (or their monetary equivalent) to Intelligen.

**WHEREFORE**, Intelligen demands judgment on the causes of action as follows:

(a) On Count One, a judgment against dVentus in the amount of $485,551.00, plus the value of the Parts sent by Intelligen to dVentus which were never returned;

(b) On Count Two, a judgment against dVentus in an amount to be determined at trial including: (a) $485,551.00 in out-of-pocket damages, plus the loss of its Parts or the monetary equivalent thereof; and (b) general and foreseeable damages arising from the net losses associated with the First and Second Avalon Projects;

(c) On Count Three, a judgment against dVentus for immediate return to Intelligen of the Parts, or their monetary equivalent;

(d) On all Counts, costs, disbursements and attorneys' fees of this action, together with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
February 23, 2015

MORRISON COHEN LLP

By: _____
Danielle C. Lesser
dlesser@morrisoncohen.com
Joaquin Ezcurra
jezcurra@morrisoncohen.com
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Attorneys for Plaintiff*

#5513678 v5 \024083 \0002