UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

INTELLIGEN POWER SYSTEMS, LLC,

                              Plaintiff,

         -v-

dVENTUS TECHNOLOGIES LLC,

                             Defendant.

-------------------------------------------------------------------X

14 Civ. 7392 (PAE)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/2/2015

PAUL A. ENGELMAYER, District Judge:

In May 2013, plaintiff Intelligen Power Systems, LLC ("Intelligen") entered into a supply agreement under which defendant dVentus Technologies LLC ("dVentus") was to produce specialized electrical equipment for Intelligen. Intelligen alleges that dVentus failed to deliver the equipment, even when given far more time to perform than the parties had agreed upon. Intelligen's Amended Complaint ("AC") brings claims for (1) fraudulent inducement, (2) breach of contract, and (3) replevin. dVentus now moves to dismiss the AC. For the reasons set forth below, the Court denies the motion to dismiss the breach of contract and fraudulent inducement claims, but dismisses the replevin claim.

## I.    Background[1]

### A.    The Parties

Intelligen is a New York LLC whose President is David Lesser and whose Chief Operating Officer is Sal Cona. AC ¶¶ 12, 18, 19. Intelligen manufactures cogeneration

---

[1] These facts are drawn primarily from Intelligen's AC. *See* Dkt. 49. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141,

equipment for onsite production of combined heat and power ("CHP").  *Id.* ¶ 17.  Cogeneration

is the process by which electricity and useful heat are simultaneously created.  As Intelligen

explains:

> Cogeneration is the process whereby a single fuel source, such as natural gas, is
> used to produce both electrical and thermal energy.  An onsite cogeneration system
> is more efficient than a utility operated central power plant because thermal energy
> that would be otherwise wasted is captured and used at the facility.  Producing
> electricity creates heat.  Cogeneration equipment captures that heat and uses it to
> supply hot water, steam, space heating and cooling.  The result is a much more
> efficient use of fuel which can generate substantial savings for the end user while
> lowering their carbon footprint. . . .  Intelligen's cogeneration systems use a natural
> gas fired engine to spin a generator to produce electricity.  Con Edison requires an
> inverter based system be used at the interface between the electrical generator at
> the building and the Con Edison utility grid.  Intelligen sought to incorporate
> [electrical e]quipment into its standardized package for projects in the Con Edison
> territory . . . .

*Id.* ¶¶ 2, 4.  To give one example, producing electricity often results in some wasted energy, but

cogeneration efficiently avoids this result.

Significant here, the New York State Energy Research and Development Authority

("NYSERDA") offers incentive programs to encourage use of cogeneration.  *Id.* ¶ 3.  However,

Intelligen needed specialized electrical equipment (the "Equipment") to achieve the necessary

efficiencies in Con Edison territory and thereby qualify for NYSERDA incentives.  *Id.* ¶ 4.

---

145 (2d Cir. 2012).  The Court also considered the documents attached to the Declaration of
Frederick R. Juckniess in support of the motion to dismiss, Dkt. 58 ("Juckniess Decl."), as well
as the documents attached to the Declaration of Danielle C. Lesser in opposition to that motion.
Dkt. 62 ("Lesser Decl.").  Because these documents were incorporated into the AC by reference,
they are properly considered on this motion.  *See City of Pontiac Policemen's & Firemen's Ret.
Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving motion to dismiss, the court
"may consider," *inter alia*, "any statements or documents incorporated in it by reference . . . .")
(citation omitted); *accord Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011).

The dispute here arose after dVentus contacted Intelligen, seeking to supply Intelligen with the Equipment.[2]  *Id.* ¶ 22.  A Michigan LLC, dVentus is "a renewable energy technology company that develops and manufactures innovative and customized solutions for energy conversion and energy management systems."  *Id.* ¶¶ 13, 20.  Its CEO is Daniel Gizaw.  *Id.* ¶ 21. For its part, Intelligen was interested in working with dVentus because Intelligen had received an order for a project that required the inclusion of this Equipment in order to obtain a NYSERDA incentive.  *Id.* ¶ 5.

**B.      The Parties' Negotiations and the Agreement**

In June 2012, dVentus first contacted Intelligen, seeking to supply Intelligen with the Equipment it needed.  *Id.* ¶ 22.  On June 14, 2012, a dVentus marketing employee (Fana Abay) sent Cona an email touting dVentus's qualifications, "broad experience," and certifications.  *Id.* ¶¶ 23–24.

Between September 2012 and May 2013, the principals of the two entities had several direct conversations, as Gizaw spoke by telephone, Skype, or in person with Lesser and/or Cona. *Id.* ¶ 26.  These "discussions focused on dVentus convincing Intelligen that dVentus readily possessed the design, engineering and manufacturing capabilities to produce the Equipment."  *Id.*

The parties' communications during this period included the following.  On November 26, 2012, Gizaw gave a telephonic presentation, in which he "represented that he had a generator and converter package designed for the wind turbine industry which could be easily adapted to" Intelligen's needs.  *Id.* ¶ 33.  On January 27, 2013, Gizaw confirmed by email "that the delivery

---

[2] The AC does not make clear how dVentus learned of Intelligen's interest in the Equipment.

[of the Equipment] would take 20 weeks 'if everything looks good.'" *Id.* ¶ 36.[3]  In a conference

call on March 15, 2013, "Gizaw represented that he had six engineers who would be assigned

Equipment fabrication." *Id.* ¶ 38.  On March 18, 2013, Gizaw emailed Cona with a price

estimate and "an estimated lead-time of 16 weeks, plus 4 weeks for testing, plus the time to ship

components from Ethiopia to Ann Arbor," Michigan.  *Id.* ¶ 40.  On April 13, 2013, at an in-

person meeting at Intelligen's factory in New York, Gizaw stated that lead times for the first set

of units was "approximately sixteen weeks," and that later deliveries would be faster.  *Id.* ¶¶ 41–

42.  Gizaw also stated that the equipment would be partly made at dVentus's facility in Ethiopia,

and then shipped to its Michigan facility for final assembly and testing.  *Id.* ¶ 41.  On April 24,

2013, shortly before Intelligen and dVentus entered into the Supply Agreement ("SA"),

Intelligen submitted a purchase order to dVentus for the equipment at issue, for a total amount of

$201,050.00 (the "Purchase Order").  *Id.* ¶ 49; *see also* Juckniess Decl. Ex. 2; Lesser Decl. Ex. 3.

On May 7, 2013, the parties executed the SA.  AC ¶ 50; *see also* Juckniess Decl. Ex. 4;

Lesser Decl. Ex. 2.  Among its provisions, the SA states that it would continue in effect until

December 31, 2015, "unless terminated earlier in accordance with the provisions hereof."  SA

§ 1.1.  It also provides that all purchase orders between the parties would be governed by the SA.

*Id.* § 1.3.  It further provides that dVentus can "postpone delivery free of charge for a maximum

of 4 weeks."  *Id.* § 8.4.  The SA also contains a merger clause and a limitation on liability clause.

*Id.* §§ 14, 17.

Intelligen alleges that, "[c]ontemporaneously with the execution of the [SA], on or about

May 7, 2013, and thus as part of the contract between the parties, dVentus submitted the Invoice

---

[3] In February 2013, in reliance on Gizaw's estimates, "Intelligen applied for NYSERDA
approval for its system, incorporating the Equipment."  *Id.* ¶ 37.  This application process
required significant time and expense.  *Id.*

to Intelligen which demanded a deposit of $78,551.00 for the Equipment ordered pursuant to the Purchase Order." AC ¶ 50.  The Invoice has a "Ship Date" column, in which "16 Wks est" is written.  Juckniess Decl. Ex. 3; Lesser Decl. Ex. 4; *see also* AC ¶ 51.  On May 9, 2013, Intelligen paid dVentus the $78,551.  AC ¶ 52.  On September 6, 2013, Intelligen provided dVentus with its own parts and equipment, as requested by dVentus for design and testing.  *Id.* ¶ 53.

### C.     dVentus's Alleged Failure to Perform

Intelligen expected a September 2013 delivery of the Equipment.  *Id.* ¶ 66.  On a May 16, 2013 conference call, Gizaw told Lesser and Cona that dVentus had ordered "the long lead time components." *Id.* ¶ 63.  In July 2013, however, dVentus pushed back the delivery date for the equipment from September 2013 to October 2013.  *Id.* ¶ 69.  In mid-August 2013, Gizaw confirmed that the delivery was on schedule.  *Id.* ¶ 65.  In October 2013, Intelligen continued to seek updates, but "dVentus became increasingly non-responsive," *id.* ¶ 67; and when the parties were in contact, "dVentus was unwilling to provide specifics," *id.* ¶ 68.

On October 29, 2013, "Gizaw admitted that dVentus had not ordered any parts," despite his earlier representations to the contrary.  *Id.* ¶ 70.

On December 3, 2013, "dVentus agreed to come to New York to discuss the status of the project" in a meeting to be held on December 6.  *Id.* ¶ 73.  On December 5, however, Gizaw canceled the trip.  *Id.*  That month, Gizaw "again pushed the date of delivery back," this time to February 2014—"five months after the Equipment was originally promised."  *Id.* ¶ 74.

As of March 2014, the equipment still had not been delivered and dVentus would not give Intelligen a firm delivery date.  *Id.* ¶ 76.

By letter dated March 21, 2014, Intelligen accused dVentus of anticipatorily repudiating the agreement.  *Id.* ¶ 77.  dVentus failed to cure its alleged breach within 15 days, the time provided by the SA to cure.  *Id.* ¶ 78.

**D.    Procedural History**

On April 28, 2014, Intelligen filed suit in New York State Supreme Court in Manhattan, alleging fraudulent inducement, breach of contract, and replevin.  *See* Dkt. 1, Ex. A.  Intelligen had difficulty serving dVentus's sole member, Gizaw, then in Ethiopia at dVentus's factory.  *See* Dkt. 16; Dkt. 19.

In September 2014, dVentus removed this case.  *See* Dkt. 1.  On Intelligen's motion to remand, this Court found the removal timely because Intelligen's summons with notice had not identified Intelligen's member(s) or their citizenship and therefore had not triggered the running of the statutory 30-day deadline for removal.  *See id.*, Ex. A; Dkt. 30.

On January 6, 2015, Intelligen filed its initial Complaint, Dkt. 37, precipitating dVentus's first motion to dismiss, Dkt. 43.

On February 23, 2015, Intelligen filed its AC, the operative complaint here.  *See* Dkt. 49.  The AC brings three causes of action: (1) fraudulent inducement, based on seven allegedly false and material statements that dVentus made between September 2012 and May 2013; (2) breach of contract, based on dVentus's alleged failure to deliver the Equipment within about 16 weeks, or alternatively, within a "reasonable time" under the New York Uniform Commercial Code; and (3) replevin, based on dVentus's alleged refusal to return certain of Intelligen's parts.

On March 16, 2015, dVentus again moved to dismiss, Dkt. 56, and filed a memorandum of law in support, Dkt. 57 ("Def. Br."), and an accompanying declaration, Dkt. 58 ("Juckniess Decl.").  On April 6, 2015, Intelligen submitted a memorandum of law in opposition to the

motion to dismiss, Dkt. 63 ("Pl. Br."), and an accompanying declaration, Dkt. 62 ("Lesser Decl."). On April 13, 2015, dVentus submitted a reply brief, Dkt. 66 ("Def. Reply Br."). On May 21, 2015, the Court held argument.

## II.   Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).[4]

---

[4] More demanding pleading standards govern claims sounding in fraud, including, in this case, Intelligen's claim of fraudulent inducement. The Court reviews these standards below. *See infra* pp. 15–16.

## III.   Discussion

The Court analyzes Intelligen's contract claim first, and then addresses its replevin and fraudulent inducement claims.  The parties agree that New York law applies.  *See, e.g.*, Def. Br. 1, 9, 15–16, 20; Pl. Br. 8, 16, 21, 24.

### A.   Breach of Contract

New York law requires that a claim for breach of contract allege: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Intelligen's breach of contract claim adequately pleads these elements.  At its core, the AC alleges that Intelligen paid a $78,551 deposit for equipment that was to be delivered in about 16 weeks, but that, some eight months later, Intelligen had received nothing from dVentus other than evasive responses and repeatedly revised estimates of the delivery date.  *See* AC ¶¶ 66–76. Indeed, dVentus acknowledged in late October 2013 that it had not even ordered the necessary parts, even though, more than five months earlier, it had represented to Intelligen that it had done so.  *Id.* ¶ 70.  These allegations, if established, would establish a breach:  The parties had an agreement; Intelligen performed by, *inter alia*, paying its deposit; dVentus failed to perform by failing to deliver the product as promised; and Intelligen suffered damages as a result, including the loss of $78,551 deposit it paid for nothing in return.  *See Johnson*, 660 F.3d at 142.  Further, as alleged, Intelligen met its obligations under the SA, in that it put dVentus on notice of its breach, and dVentus failed to cure within 15 days.  *See* AC ¶¶ 77–78.

8

In challenging Intelligen's pleadings, dVentus primarily relies on the fact that the Supply Agreement does not recite a specific delivery date.  It is true that, in various respects, the SA is far from a model of clarity and precision.[5]  And the SA does not set out a delivery date for the Equipment.  But the SA does specify that it governs all purchase orders between the parties: "All POs [purchase orders], acceptances and other writings or electronic communications between the parties shall be governed by this Agreement."  *Id.* § 1.3.  And the SA leaves it to the parties to set particular shipment dates for specific shipments.  *Id.* §§ 8, 8.1, 8.2, 8.3, 8.4. Section 8 states that Intelligen would provide dVentus with "delivery schedules, comprising all Open Purchase Orders"; Section 8.1 clarifies that the "delivery schedule shall contain the quantity and delivery dates"; Section 8.2 obligates dVentus to "meet the delivery schedules provided for," unless due to a force majeure event, *see id.* § 8.3; and Section 8.4 gives dVentus a "buffer" or "cushion" in all instances:  dVentus can "postpone delivery free of charge for a maximum of 4 weeks."  In other words, the SA establishes the framework and guideposts for the parties' relationship, while leaving it to the parties, going forward, to set delivery dates for specific shipments, subject to Section 8.4's buffer clause.

As to the specific equipment delivery that is the subject of the AC, the AC alleges that, pursuant to the May 7, 2013 invoice, "dVentus agreed to ship the [E]quipment from dVentus'

---

[5] For example, the agreement (1) states that it "will continue until December 31, 2015," SA § 1.1, but it also provides that it "will terminate five years from the date" it was signed (May 7, 2018), unless terminated earlier, *id.* § 13.1; (2) states in its "force majeure" section that "in the event that SELLER'S performance under this Agreement is delayed more than thirty (60) days . . . ," *id.* ¶ 11, without clarifying whether the operative amount of delay is 30 or 60 days; (3) twice refers to the "liquidated damages under Section 11 of this Agreement," *id.* § 14.1; *id.* § 8.3, whereas in fact Section 11 addresses a different topic altogether (force majeure), and no other SA provision addresses liquidated damages; and (4) refers to Appendix 1 in multiple provisions, *id.* § 1.1; *id.* § 6.5, but neither party has provided a document suggesting that Appendix 1 exists.

Ann Arbor facility within 16 weeks of the Invoice date." AC ¶ 9.  However, Intelligen alleges, "dVentus failed to deliver the Equipment by September 2013, as promised." *Id.* ¶ 66.  Instead, dVentus repeatedly pushed back the delivery date, first to October 2013, and then to February 2014. *Id.* ¶¶ 69, 74.  When the Equipment still had not been delivered as of March 2014, Intelligen informed dVentus that it was in breach. *Id.* ¶ 77.  dVentus was "unable to provide Intelligen with a firm delivery date for the Equipment," but estimated a delivery date of late May 2014. *Id.* ¶ 76.  dVentus failed to cure its breach within 15 days of written notice, as § 13.3 of the SA required. *Id.* ¶ 78.  According to the AC:  "The Agreement was therefore terminated." *Id.*  Intelligen further alleges that "dVentus has never provided any proof that it has fabricated the Equipment, despite due demand for such proof, has not delivered any of the Equipment to Intelligen, has not returned the Parts Intelligen provided to dVentus and has failed to return Intelligen's $78,551.00 deposit under the Invoice." *Id.* ¶ 89.

The May 7, 2013 invoice recites a "ship date" as "16 Wks est," meaning, presumably, an estimated 16 weeks.  dVentus argues that the lack of a precise delivery date is fatal to Intelligen's breach of contract claim.  However, on the facts pled, that is wrong.  To be sure, a delivery date of "16 weeks estimated" does not set a specific delivery date:  The qualifying word "estimated" would have given dVentus some latitude beyond literally the date 16 weeks away—plus the contractual four-week cushion—as to when to deliver the Equipment.  But "estimated" does not mean "whenever we feel like it" or "there's no deadline whatsoever."  *See A. Leo Nash Steel Corp. v. C. D. Perry & Sons, Inc.*, 491 F.2d 948, 950 (2d Cir. 1974) (where written contract provided for "delivery in early spring," a valid delivery could "not have been fulfilled by delivery in August"); *ABS P'ship v. AirTran Airways, Inc.*, 1 A.D.3d 24, 27–28 (1st Dep't, 2003) (rejecting defendant's claim that delivery schedule in contract was "merely an estimate" and

"advisory only," because then the "contract provision for canceling orders becomes virtually

nullified").  And dVentus's suggestion to that effect is at odds with other portions of the contract,

including the four-week "cushion" provision, *id.* ¶ 8.4, and the general requirement that dVentus

deliver the equipment ordered.  *See Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir.

2012) ("'[T]he contract should be construed so as to give full meaning and effect to all of its

provisions.'") (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195,

206 (2d Cir. 2005)).

Furthermore, even if the SA (and the incorporated purchase order) had not contained an

estimated due date, dVentus's construction—in effect that there was no deadline for delivery—

would be contrary to the New York Uniform Commercial Code ¶ 2-309(1), which provides that

where the time for shipment or delivery under a contract is not agreed upon by the parties, that

time shall be a "reasonable time."  Reasonableness depends on three factors: the nature, purpose,

and circumstances of the action.  N.Y. U.C.C. ¶ 1-205.  Construing all inferences in Intelligen's

favor, as the Court must on a motion to dismiss, the AC fairly pleads that it was unreasonable, in

the face of a 16-week estimate, for dVentus not to have performed 55 weeks later, and that it was

further unreasonable for dVentus not to have even *ordered* the necessary parts for the project *25

weeks* after the order was placed.  *See* AC ¶ 70.

dVentus next argues that Intelligen's contract breach claim must be dismissed because

dVentus cured any breach.  dVentus argues that, after Intelligen sent dVentus a letter taking the

position that dVentus had anticipatorily repudiated the SA, dVentus cured by sending a March

18 email in which it "estimate[d]" that the equipment would be shipped to the United States by

May 31, 2014.  Def. Br. 18–19.  That claim is simply wrong.  In the context of the SA, curing

meant performing, not making a new prediction as to when delivery might occur.  *See Trans*

*World Metals, Inc. v. Southwire Co.*, 769 F.2d 902, 906–07 (2d Cir. 1985) (holding that Southwire could not terminate a contract "[b]ecause Trans World had cured any potential default by *completing all requested deliveries* before the period for cure expired") (emphasis added); *SVS, Inc. v. Rabbit Ears Prods., Inc.*, No. 91 Civ. 6632 (CSH), 1992 WL 91183, at *10 (S.D.N.Y. Dec. 12, 1991) ("A nondefaulting party cannot terminate a contract with a party that cures all defects within the cure period."). Here, the SA set a cure period of 15 days. SA § 13.3. dVentus neither delivered, nor represented that it could deliver, within that period. AC ¶ 76. Indeed, as alleged, dVentus never delivered the Equipment to Intelligen. *Id.* ¶ 89.

dVentus next argues that Intelligen "fails to allege" that it, Intelligen, did not cause the delays by requesting changes in the specifications of the equipment. Def. Br. 17. On a motion to dismiss, that argument cannot carry the day. On summary judgment, perhaps, or at trial, dVentus may seek to establish that it did not breach, including on the ground that Intelligen caused the delays. But the AC fairly pleads a breach by dVentus. The plausibility standard of *Iqbal* does not require Intelligen to negate every possible defense. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

In its final challenge to the contract claim, dVentus challenges the AC's pleadings as to damages. dVentus argues that Intelligen did not incur any damages cognizable under the SA, and, alternatively, that the damages alleged are consequential damages, precluded under the SA.

As to dVentus's first damages argument, the AC pursues: "(a) $485,551.00 in out-of-pocket damages, plus the loss of its Parts of the monetary equivalent thereof; and (b) general and foreseeable damages arising from the net losses associated with the First and Second Avalon Projects." AC ¶ 107. The $485,551 figure is comprised of Intelligen's $78,551 deposit, *id.*

¶ 91(h); the costs to search for, buy, and reconfigure "replacement inverters and generators" ($357,000), *id.* ¶ 91(d)–(f); and the labor required to implement the new equipment ($50,000), *id.* ¶ 91(g).

On a motion to dismiss, dVentus has not pointed to any impediment—in the SA or otherwise—to Intelligen's ability to recover its deposit, or its parts or their value.  As to the latter, Section 10.1 of the SA obliged Intelligen to provide dVentus "with support in relation to . . . testing," including by providing documents, data, drawings, "and other available materials," such as the component parts at issue here.  Notably, the SA nowhere provided that, in the event of a breach by dVentus, dVentus would be entitled to keep these items.  Section 13.4 of the SA is to the contrary:  It states that, if the agreement were terminated for any reason, dVentus "agrees to return to BUYER [Intelligen] all confidential information of BUYER or its Affiliates, and all BUYER-owned tooling, test equipment, and other property."  Further, if Intelligen's equipment is not "fully functional and undamaged," dVentus must "bear all costs associated with repair or replacement."  SA § 13.4.

Intelligen has therefore pled cognizable damages.  Intelligen in discovery may seek to prove, and dVentus to combat, these damages claims.

dVentus separately argues that the SA states that "[i]n no event, shall either party be liable to the other for any indirect, special, incidental or consequential damages."  *Id.* § 14.2. Although this provision may prove to limit the damages that Intelligen can obtain in this lawsuit, it is premature at this stage to determine the extent, if any, that this limitation on damages bars Intelligen's damages claims.  "Courts in this District have often determined, at the summary judgment stage, whether damages claims are general or consequential."  *PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, No. 12 Civ. 8570 (PAE), 2014 WL 7146357, at *12

(S.D.N.Y. Dec. 15, 2014) (citing *Phoenix Warehouse of Calif., LLC v. Townley, Inc.*, No. 08 Civ. 2856 (NRB), 2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314 (S.D.N.Y. 2009); *E. Brass & Copper Co. v. Gen. Elec. Supply Corp.*, 101 F. Supp. 410 (S.D.N.Y. 1951)); *see also id.* ("And there has been ample discovery in this case to allow the Court to classify the categories of damages at issue."). The Court defers until later in this litigation the judgment as to which, if any, of the damages sought by Intelligen are precluded by Section 14.2.

Intelligen has, therefore, properly pled a breach of contract claim.

### B.     Replevin

The doctrine of replevin governs actions for the recovery of stolen or wrongfully detained property. *Dore v. Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010). A cause of action in replevin "'must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right.'" *Id.* (quoting *Batsidis v. Batsidis*, 778 N.Y.S.2d 913, 913 (2d Dep't, 2004)). "'Demand upon, and refusal of, the person in possession of the chattel to return it [are] essential elements of a cause of action in replevin.'" *Id.* (quoting *In re Peters*, 821 N.Y.S.2d 61, 65 (1st Dep't, 2006)).

Significantly here, if "'plaintiff is essentially seeking enforcement of [a] bargain, the action should proceed under a contract theory.'" *Usov v. Lazar*, No. 13 Civ. 818 (RWS), 2013 WL 3199652, at *7 (S.D.N.Y. June 25, 2013) (quoting *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552 (N.Y. 1992)) (other citations omitted). Thus, where a plaintiff "does not allege any independent duty by Defendants outside of [a] purported contract[], Plaintiff fails to adequately state a claim for replevin." *Id.*; *accord Spanierman Gallery PSP v. Love*, No. 03 Civ. 3188 (VM), 2003 WL 22480055, *3 (S.D.N.Y. Oct. 31, 2003) (where plaintiff's replevin claim arose

only from allegations that defendants did not return object in violation of a contract, plaintiff failed to allege any distinct duties giving rise to tort liability and replevin claim should be dismissed).

These principles require dismissal of Intelligen's replevin claim. In its breach of contract claim, Intelligen alleged that: "In violation of Section 13.4 of the Agreement, dVentus failed to return the Parts to Intelligen upon termination of the Agreement." AC ¶ 106. And, in the portion of that claim seeking relief, Intelligen alleged that its damages included "the loss of its Parts or the monetary equivalent thereof." *Id.* ¶ 107. The AC does not allege an alternative basis for a duty on dVentus's part to return the property at issue. Intelligen's replevin claim thus entirely duplicates its contract claim, and is accordingly dismissed. *See Usov*, 2013 WL 3199652, at *7; *Love*, 2003 WL 22480055, *3; *Sommer*, 79 N.Y.2d at 552.

### C.     Fraudulent Inducement Claim

#### 1.     Applicable Legal Standards

As to claims alleging fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard. Such claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must "'allege facts that give rise to a strong inference of fraudulent intent.'" *Berman v. Morgan Keenan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Specifically, "'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *3 (S.D.N.Y. Apr. 12, 2012) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006)). The

particularity requirement of Rule 9(b) "serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'" *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting *O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).

A central issue here involves the relationship between Intelligen's fraudulent inducement claim and its breach of contract claim. Where a fraud claim "'is premised upon an alleged breach of contractual duties, and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie.'" *Cont'l Petroleum Corp.*, 2012 WL 1231775, at *10 (quoting *McKernin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (2d Dep't 1991)). Therefore, to maintain a claim for fraudulent inducement that does not merge with a breach of contract claim, a plaintiff must "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir. 1996) (citations omitted); *see also Rojas v. Don King Prods.*, No. 11 Civ. 848 (KBF), 2012 WL 760336, at *4 (S.D.N.Y. Mar. 6, 2012) ("intentionally-false statements . . . indicating [an] intent to perform under the contract . . . [are] not sufficient to support a claim of fraud under New York law").

Here, Intelligen bases its fraudulent inducement claim on the second of these prongs: It alleges that there were fraudulent misrepresentations collateral or extraneous to the contract. As to this requirement, there is a key distinction between a "misrepresentation of present fact,"

which is actionable, and "a misrepresentation of future intent to perform under the contract," which merges with the contract and thus cannot support a separate fraud claim. *See, e.g.*, *Gosmile, Inc. v. Levine*, 81 A.D.3d 77, 81 (1st Dep't, 2010) ("To state a claim for fraudulent inducement, there must be a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury. . . . [A] misrepresentation of present fact, unlike a misrepresentation of future intent to perform under the contract, is collateral to the contract, even though it may have induced the plaintiff to sign it, and therefore involves a separate breach of duty.") (citations omitted).  In other words, where a party seeks to "dress[] up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder," that does not state a valid fraud claim.  *Telecom Int'l Am. Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (citations and internal quotation marks omitted).

### 2.    Application

The AC alleges that dVentus made seven distinct material fraudulent misrepresentations that were intended to, and did, induce Intelligen into signing the SA.  These were that:

1. dVentus had a facility in Ann Arbor, Michigan where dVentus would assemble and test the Equipment for Intelligen;
2. dVentus possessed a generator and converter package designed for the wind turbine industry which could be easily adapted to CHP;
3. dVentus had sufficient manpower and engineering expertise to adapt its technology to CHP including the needs of Intelligen's customers, as well as the NYSERDA and Con Ed requirements;
4. dVentus employed over 30 design engineers who possessed the relevant experience to ensure timely fabrication of the Equipment and to timely and promptly fulfill Intelligen's orders;
5. Gizaw personally had electrical engineering capability sufficient to design and manufacture the Equipment;
6. dVentus had the capability of configuring the Equipment for use with 208 Volt or 480 Volt; and
7. dVentus possessed the financial resources to complete the design and manufacture of the Equipment.

AC ¶ 93(a)–(g).  dVentus argues that: (1) these statements all relate to performance under the contract, and thus are *per se* inactionable as fraud; (2) as to several statements, the AC fails to identify either the speaker or when the statement was made, and thus fails Rule 9(b); and (3) the AC does not plead facts that give rise to a strong inference of fraudulent intent, as the cases construing Rule 9(b) demand.  The Court considers these arguments in turn.

### a.   Whether the statements all concern dVentus's intent as to contractual performance

dVentus's first argument is that all seven statements are *per se* inactionable because they relate to dVentus's intent with respect to contractual performance.  dVentus argues that, as a matter of law, these seven statements cannot support a fraud claim.

dVentus misreads the case law.  Under New York law, there is a crucial distinction "between a promissory statement of what *will be done in the future* that gives rise only to a breach of contract cause of action and a misrepresentation of a *present fact* that gives rise to a separate cause of action for fraudulent inducement."  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (citing *Stewart v. Jackson & Nash*, 976 F.2d 86, 88–89 (2d Cir. 1992)) (emphases added).

This distinction is helpfully illustrated in *Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808 (1st Dep't, 1976).  The parties had entered into an exclusive 15-month distribution agreement.  The plaintiff-distributor, Coolite Corp., agreed to buy at least 4 million light sticks from the defendant, American Cyanamid, which manufactured the light sticks.  *Id.* at 810.  In the negotiating process, American Cyanamid represented that, *inter alia*, it had "spent substantial amounts for research to develop the light stick; had fully tested the light stick, which could be produced in large commercial quantities of merchantable quality; had the capability and would

develop light sticks with other colors . . . ; the outer plastic tube [of the light stick] would not

leak; [and] the product would work and have a shelf-life of at least two years." *Id.* The light

sticks, however, were not of merchantable quality, leading Coolite to bring suit, claiming both

fraud and breach of contract. *Id.* Coolite alleged that American Cyanamid's above

representations were false. *Id.* The court permitted the fraud claim to go forward, explaining:

> [A] fair reading of the complaint affords ample basis for concluding Cyanamid's
> representations, concerning the state of its research and testing and its ability to
> produce a perfected light stick, when made, were representations of fact and not
> merely promises of future action. When the complaint and the contract, which it
> incorporates, are considered together it is apparent Coolite claims it was induced to
> enter into the distributorship agreement because Cyanamid represented that as a
> result of thorough testing it was then presently able to carry out its contractual
> commitment to produce commercial quantities of merchantable light sticks and that
> these representations were knowingly false and untrue when made. Allegations of
> this character are sufficient to sustain a fraud claim.

*Id.* (citing *Terris v. Cummiskey*, 203 N.Y.S.2d 445 (3rd Dep't, 1960)).

*Coolite* teaches that representations during the negotiating process as to a manufacturer's

*present capacity* are actionable in fraud, if properly alleged. *Accord EED Holdings v. Palmer*

*Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 279 (S.D.N.Y. 2004) (where parties contracted

for construction of a yacht that was not built to the specifications in agreement, court permitted

fraud and contract claims to proceed, because contract claim sought damages sustained by

plaintiff "as a result of [defendant's] breaches of the Construction Agreement [whereas] fraud

claim seeks to recover the damages [plaintiff] has allegedly sustained as a result of being induced

to enter into the Construction Agreement by [defendant]'s alleged misrepresentations of fact

concerning the present conditions of [defendant]'s finances and operations."); *see also Allegheny*

*Energy*, 500 F.3d at 184 (alleged misrepresentations remain actionable in fraud even where they

also constituted a breach of contractual warranties); *Channel Master Corp. v. Aluminum Ltd.*

*Sales*, 4 N.Y.2d 403, 407 (N.Y. 1958) (defendant's allegedly false statement that it had the capacity to sell to plaintiff 400,000 pounds of aluminum was actionable as fraud).

Here, dVentus's allegedly fraudulent statements are all representations of present facts. In particular, they are representations as to dVentus's present capacity—*e.g.*, the existence of a dVentus factory, dVentus's employment of 30 experienced engineers, the engineering expertise of dVentus executive Gizaw, and dVentus's financial wherewithal to take on a new project. *See* AC ¶ 93. These representations are not "contractual promises regarding prospective performance." *Allegheny Energy*, 500 F.3d at 184. Accordingly, provided they are pled in compliance with Rule 9(b), they are actionable. The Court turns to that question next.

### b. Whether the Amended Complaint properly identifies the speaker and circumstances for each alleged misrepresentation

dVentus next argues that four of the seven allegedly fraudulent statements are not properly pled, because Rule 9(b) requires the plaintiff to "identify the speaker" and "state where and when" each allegedly fraudulent statement was made. *Cont'l Petroleum*, 2012 WL 1231775, at *3 (quoting *Lerner*, 459 F.3d at 292–93). The Court examines each of these four statements in turn.[6]

The first challenged statement by dVentus is that "dVentus had a facility in Ann Arbor, Michigan where dVentus would assemble and test the Equipment for Intelligen." *Id.* ¶ 93(a). Significantly, the AC earlier had alleged that, "[o]n or about April 13, 2013, in a face to face meeting which took place at Intelligen's factory, Gizaw . . . stated that the equipment would be partially fabricated in dVentus's Ethiopia facility and shipped to its Michigan facility for final

---

[6] The Court has independently assessed the three, *unchallenged* statements, *see* AC ¶ 93(b), (c), (f); Def. Br. 10–11, and finds, as is not disputed, that the AC properly alleges the "who, when, and where" of each statement. Gizaw allegedly made each of these three statements at an April 13, 2013 meeting at Intelligen's factory in New York. *See* AC ¶¶ 29, 30, 41(b).

assembly and factory testing." *Id.* ¶ 41.  Gizaw's April 13, 2013 statement is clearly the basis for the representation at issue in ¶ 93(a); the representation in ¶ 93(a) differs in only one respect— the allusion to Ann Arbor specifically instead of Michigan generally.  And, in an email from Gizaw to Cona dated three weeks earlier (March 18, 2013), Gizaw had given "a price estimate and an estimated lead-time of 16 weeks, plus 4 weeks for testing, plus the time to ship components from Ethiopia to Ann Arbor," where Gizaw had represented that dVentus had a facility. *Id.* ¶ 40.  The first of the alleged misrepresentations that dVentus challenges thus satisfies Rule 9(b)'s "who, when, and where" requirements.

The second challenged statement by dVentus is that "dVentus employed over 30 design engineers who possessed the relevant experience to ensure timely fabrication of the Equipment and to timely and promptly fulfill Intelligen's orders." *Id.* ¶ 93(d).  Paragraph 93(d) of the AC, which contains the fraudulent inducement allegation, does not recite the required who, when, and where; it states generally that dVentus made a series of misrepresentations in emails, telephone calls, and Skype calls, and at an in-person meeting that occurred between September 2012 and May 2013. *Id.*  In its brief, Intelligen points to an earlier part of the AC which alleges that Gizaw, on April 13, 2013, "stated that dVentus had over 30 design engineers," *id.* ¶ 41(d), arguing that Paragraph 93(d) references the same statement.  Pl. Br. 11–12.  But Paragraph 93(d) does not clearly reference Paragraph 41(d), and the content of the two statements is meaningfully different, in that the statement attributed to Gizaw on April 13, 2013, says nothing to the effect that the design engineers had the relevant experience to complete this particular project promptly.  Nor does any other part of the AC allege by whom and when the statement recited in Paragraph 93(d) was made.  Intelligen therefore has failed to adequately plead this alleged

misrepresentation. *See Eternity Global*, 375 F.3d at 187; *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).

The third challenged statement by dVentus is that "Gizaw personally had electrical engineering capability sufficient to design and manufacture the Equipment." AC ¶ 93(e). Here, too, Paragraph 93(e) does not recite the who, when, and where requirements as to this statement. Intelligen contends that two earlier portions of the AC, ¶ 31 and ¶ 41(a), supply the requisite specificity. Pl. Br. 11–12. But in these portions of the AC, Gizaw is quoted as stating merely that "dVentus had electrical engineering expertise," *id.* ¶ 31; Gizaw "introduced 'Mekdam,' his engineering manager," in a November 26, 2012 email, *id.*; and said at the April 13, 2013 meeting that "[h]e personally had electrical engineering capability and was supported by a team of additional engineers," *id.* ¶ 41. These statements differ from the statement in ¶ 93(e), the crux of which is that dVentus had engineering capacity *sufficient* to manufacture the Equipment at issue. To be sure, the statements in ¶¶ 31 and 41 may perhaps be taken to *imply* such capacity, but they do not so state, and conceptually, there is a difference between having generic expertise and having expertise tailored to a customer's specific task. The AC therefore fails to identify with particularity the who, when and where of the specific statement alleged to be fraudulent. *See Eternity Global*, 375 F.3d at 187; *Harsco Corp.*, 91 F.3d at 347.

The final statement challenged by dVentus is that "dVentus possessed the financial resources to complete the design and manufacture of the Equipment." AC ¶ 93(g). Again, there is no explanation in Paragraph 93(g) as to who made this statement and when and where it was made, and the other portions of the AC do not supply this detail. Intelligen has therefore failed to properly plead this statement. *See Eternity Global*, 375 F.3d at 187; *Harsco Corp.*, 91 F.3d at 347.

### c.   Whether the remaining statements give rise to a strong inference of fraudulent intent

The four alleged misrepresentations that the AC alleges with the necessary particularity are thus that:

1. dVentus had a facility in Ann Arbor, Michigan where dVentus would assemble and test the Equipment for Intelligen;
2. dVentus possessed a generator and converter package designed for the wind turbine industry which could be easily adapted to CHP;
3. dVentus had sufficient manpower and engineering expertise to adapt its technology to CHP including the needs of Intelligen's customers, as well as the NYSERDA and Con Ed requirements; and
4. dVentus had the capability of configuring the Equipment for use with 208 Volt or 480 Volt.

AC ¶ 93.  The remaining issue as to these statements is whether the AC adequately alleges that they were made under circumstances that give rise to a strong inference of fraudulent intent.

In evaluating that issue, the Court is guided by familiar standards:  "Although '[m]alice, intent, knowledge and other condition of mind of a person may be averred generally,' Fed R. Civ. P. 9(b), this leeway is not a 'license to base claims of fraud on speculation and conclusory allegations.'"  *Eternity Global*, 375 F.3d at 187 (quoting *Acito*, 47 F.3d at 52).  Instead, a plaintiff "'must allege facts that give rise to a strong inference of fraudulent intent,' which may be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  The Circuit thus requires "particularized facts to support the inference that the defendants acted recklessly or with fraudulent intent."  *Id.* (quoting *Shields*, 25 F.3d at 1129).

That said, the Second Circuit has directed district courts to be "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences," *Press v.*

*Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citing, *e.g.*, *In re Time Warner Inc.*

*Secs. Litig.*, 9 F.3d 259, 270–71 (2d Cir. 1993), because intent is generally a question of fact, *id.*

(citing *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 194 (2d Cir. 1998); *S.E.C. v. First Jersey*

*Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)).  In other words, consistent with the language of

Rule 9(b), "'great specificity [is] not required with respect to . . . allegations of . . . scienter,'"

because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind."

*Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987) (quoting *Goldman v.*

*Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985)).  Plaintiffs must "specifically plead those events

which give rise to a strong inference that the defendants had an intent to defraud, knowledge of

the falsity, or a reckless disregard for the truth."  *Id.* (citation and internal quotation marks

omitted).

   The AC's allegations meet that standard.  Relevant here, the AC alleges that (1) dVentus

contacted Intelligen; (2) dVentus touted its capacity and expertise throughout the negotiating

process; (3) dVentus emphasized that it already possessed equipment that it could easily adapt to

Intelligen's needs; (4) dVentus highlighted that it could perform quickly, which was vital to

Intelligen given its time-sensitive needs; (5) Intelligen would not have entered into the SA, but

for dVentus's representations as to its present capacity and ability to make prompt production;

(6) dVentus demanded an immediate deposit of $78,551; (7) dVentus received and retained that

deposit; (8) dVentus acknowledged that it had not even ordered the necessary parts as of late

October 2013—nearly six months after dVentus had initially represented to Intelligen that it had

already ordered these parts, and about two months after the product was due; and (9) dVentus, in

fact, never provided Intelligen with the Equipment or even gave any indications of progress.  AC

¶¶ 22, 30, 31, 33, 34, 40, 41, 42, 50, 52, 66, 67, 70, 78, 89.

These allegations easily suffice to support the allegedly fraudulent motives that the AC assigns to dVentus:  It alleges that dVentus sought, by making knowingly false statements, both "to secure the Agreement with Intelligen" and "to use the Agreement with Intelligen to help obtain financing from other sources," because dVentus was then negotiating with, but had yet to obtain financing from, a third party.  AC ¶¶ 95–96; *see also id.* ¶ 75 ("On January 29, 2013 [sic—probably 2014], Gizaw 'sincerely apologize[d]' for the delays which he attributed to problems with 'suppliers, logistics and long term financing.'").  Indeed, Intelligen's allegations that dVentus, when presented with an opportunity in contract negotiations to defraud Intelligen, dissembled about its production capacity, are similar to those that courts, denying motions to dismiss, have held state a valid claim for fraudulent inducement.  *See, e.g.*, *Coolite Corp.*, 384 N.Y.S.2d at 811 (fraud claim satisfied pleading requirements because defendant allegedly "misrepresented its ability to produce" the product at issue, and plaintiff "would not have entered into the agreement but for" defendant's representations as to its capabilities); *EED Holdings*, 387 F. Supp. 2d at 276 (holding actionable as fraud defendant's alleged misrepresentation that it "had the capability and wherewithal to properly construct the yacht sought by [plaintiff] in a timely manner"); *Cohen v. Koenig*, 25 F.3d 1168, 1174 (2d Cir. 1994) (scienter sufficiently pled where complaint "spelled out circumstances from which it could easily be inferred that the [defendants] had a motive to make false representations"); *Channel Master Corp.*, 4 N.Y.2d at 407 (defendant's allegedly false statement that it had the capacity to sell to plaintiff 400,000 pounds of aluminum held actionable as fraud); *cf. Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (N.Y. 1986) (affirming denial of motion to dismiss, where allegation was "'a representation of present fact, not of future intent' . . . collateral to, but which was the

inducement for the contract, and thus was neither duplicative of the [breach-of-contract claim] nor barred by the general merger clause contained in the contract.") (citations omitted).

Although three of the seven statements on which the AC's claim of fraudulent inducement is based were not pled consistently with Rule 9(b), the other four are. The AC therefore states a claim of fraudulent inducement.[7] It remains, of course, to be seen whether factual discovery validates this claim.

## CONCLUSION

For the foregoing reasons, the Court grants dVentus's motion to dismiss as to Intelligen's replevin claim, but denies dVentus's motion to dismiss Intelligen's claims for breach of contract and fraudulent inducement. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 43 and 56.


SO ORDERED.

_Paul A. Engelmayer_
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: June 2, 2015
       New York, New York

---

[7] Although the Court has not relied on it in reaching this conclusion, the finding of a validly pled claim is reinforced by the principle that "Rule 9(b)'s requirements may be relaxed as to matters particularly within the opposing party's knowledge." *M & T Mortgage Corp. v. White*, 736 F. Supp. 2d 538, 561 (E.D.N.Y. 2010) (quoting *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 545 (E.D.N.Y. 1987); citing *Credit & Finance Corp. Ltd. v. Warner & Swasey Co.*, 638 F.2d 563, 566–67 (2d Cir. 1981)); *accord Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1135–36 (S.D.N.Y. 1996).